UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 06-61844-CIV-MARRA

GEORGE DURGIN, individually and on behalf
of all others similarly situated,

Plaintiffs,

v.

ANTONIO P. MON et al.,

Defendants.

_____

**<u>OPINION AND ORDER</u>**

This cause is before the Court upon Defendant David J. Keller's Motion to Dismiss

Plaintiff's Consolidated Amended Class Acton Complaint (DE 176); Defendant Randy L.

Kotler's Motion to Dismiss the Consolidated Amended Class Action Complaint (DE 177);

Defendant Antonio B. Mon's Motion to Dismiss Plaintiff's Amended Class Action Complaint

(DE 179) and Defendant Tommy L. McAden's Motion to Dismiss Plaintiff's Consolidated

Amended Class Action Complaint (DE 190).  The motions are fully briefed and ripe for review.

The Court held oral argument on the motions.  The Court has carefully considered the motions

and the arguments of counsel and is otherwise fully advised in the premises.

<u>I.  Background</u>

The allegations of the Amended Complaint, which for purposes of these motions the

Court must accept as true, are as follows:

Technical Olympic USA, Inc. ("TOUSA" or "the Company") builds and markets homes

under a variety of brand names that are sold to all segments of the housing market.  The

Company operates in various geographic regions, with the majority of its business concentrated in the South and Southwest and in the mid-Atlantic region. (Am. Compl. ¶ 34.)  TOUSA conducts some of its business through joint ventures with other home building companies.  These joint ventures acquire, develop and sell land and/or home sites and construct and sell homes. (Am. Compl. ¶ 37.)

Lead Plaintiff Bricklayers & Trowel Trades International Pension Fund ("Bricklayers") purchased TOUSA common stock during the Class Period and sustained damages. (Am. Compl. ¶ 23.)  Defendant Antonio Mon has been a director of the Company and its Executive Vice Chairman, Chief Executive Officer, and President since June 25, 2002.  From October 2001 to June 2002, Mon served as the Chief Executive Officer of Technical Olympic, Inc. ("TOI"), TOUSA's former parent company. (Am. Compl. ¶ 24.)  Defendant David J. Keller ("Keller") served as the Company's Chief Financial Officer ("CFO"), Senior Vice President and Treasurer from May 2004 until his resignation on May 31, 2006. (Am. Compl. ¶ 25.)  Defendant Randy L. Kotler ("Kotler") served as the Company's Vice President and Chief Accounting Officer from June 25, 2002 until May 31, 2006, when Kotler replaced defendant Keller as TOUSA's CFO. (Am. Compl. ¶ 26.)  Defendant Tommy L. McAden ("McAden") is a director, Executive Vice President ("EVP"), and CFO of TOUSA.[1] (Am. Compl. ¶ 27.)

The Amended Complaint alleges that "Defendants, because of their positions as officers and/or directors of the Company, were able to and did control the content of TOUSA's SEC filings, press releases and presentations to securities analysts, and other public statements

---

[1] TOUSA is no longer a defendant in this action because it and certain of its subsidiaries and affiliated entities filed for relief under Chapter 11 of the United States Bankruptcy Code in Fort Lauderdale on January 28, 2008. (Am. Compl. ¶ 40.)

pertaining to the Company during the Class Period and is responsible for the accuracy of the

public filings and press releases detailed herein, and personally liable for the misrepresentations

and omissions contained herein." (Am. Compl. ¶ 29.)  In addition, the Amended Complaint

alleges that "Defendants each had a duty to disseminate accurate and truthful information with

respect to the Company's financial condition, joint ventures, liabilities, interests, earnings,

present and future prospects, and to correct any previously issued statements that were

erroneous." (Am. Compl. ¶ 30.)

On June 6, 2005, TOUSA entered into an agreement with the Falcone Group to form a

joint venture - the JV - in order to acquire substantially all of the assets of Transeastern

Properties, Inc. ("Transeastern").  The assets consisted mostly of real estate in the Florida market

and totaled approximately 22,000 home sites. (Am. Compl. ¶ ¶ 2, 50-51.)  The transaction,

costing $857 million, was funded through a combination of equity and debt.  TOUSA contributed

$90 million in equity and the Falcone Group contributed $75 million.  To fund the remainder of

the acquisition, the Transeastern JV borrowed $675 million from a consortium of banks led by

Deutsche Bank Trust Company Americas ("DB Trust" with the other members of the

consortium, the "Lenders").  The acquisition was completed on August 1, 2005.  (Am. Compl. ¶

¶ 3, 51.)

Through a series of tiered entities owned by the Transeastern JV, each entity became a

borrower under one of the three credit agreements: (1) a senior credit agreement; (2) a senior

mezzanine agreement and (iii) a junior mezzanine agreement.  The Lenders required TOUSA to

guarantee certain actions, including repayment of the JV's loans, under specified conditions

(collectively, the "Guarantees").  (Am. Compl. ¶ ¶ 4, 53.)   The first of the two Guarantees - the

3

Completion Guarantees - obligated TOUSA to complete certain Transeastern JV construction projects should the JV default on the loans.  The second of the Guarantees - the Carve-Out Guarantees - required TOUSA to reimburse fully the Lenders for losses arising from such circumstances as fraud, intentional misconduct, waste and misappropriation, or if any party voluntarily filed for bankruptcy.  (Am. Compl. ¶ 5.)  By agreeing to these guarantee provisions, TOUSA placed approximately 70% of its net worth at risk if the Transaction JV went bankrupt, became insolvent, or if any other conditions under the Guarantees were triggered.  TOUSA did not, however, have the liquidity necessary to repay the Transaction JV's debt if the Guarantees were triggered.  (Am. Compl. ¶ 6.)

On August 1, 2005, TOUSA announced that it had completed the acquisition of Transeastern's homebuilding assets and operations, noting that the JV's then owned or controlled "approximately 22,000 homesites throughout all major Florida markets."  Commenting on the acquisition, Defendant Mon stated:

> We are excited about combining the strengths of two of Florida's premier builders . . . . This acquisition strengthens and complements our current Florida market positions, provides a strong entry into the Tampa/St. Petersburg market, and secures an excellent homesite pipeline for future growth in one of the most land-constrained markets in the country. We believe the acquisition will add approximately $35 million in net income to TOUSA's 2006 results.

(Am. Compl. ¶ 95.)

With respect to the JV's capitalization, Defendants represented that the debt, which funded the transaction, was non-recourse to the Company:

> The joint venture is funded with $675 million of debt capacity provided by Deutsche Bank, $165 million of equity, and a $20

4

> million subordinated bridge loan from TOUSA. TOUSA
> contributed $90 million of the equity in cash and the Falcone
> controlled entity contributed the remaining $75 million in the form
> of property. The debt is secured by the joint venture's assets and
> ownership interests. The joint venture debt is non-recourse to
> TOUSA.

(Am. Compl. ¶ 96.)

On August 3, 2005, the Company held a conference call with market analysts.  A portion

of the conversation follows:

> JOHN ROBBINS: All right. A segue to my next question – with
> respect to the joint venture, I mean, that's a fully capitalized
> venture. I mean, you wouldn't expect to make further
> contributions into the JV?
>
> TONY MON: We don't anticipate that at the moment. I have
> learned a long time ago never to say never.
>
> JOHN ROBBINS: That's a shrewd policy! (technical difficulty) --
> nonrecourse to Technical Olympic?
>
> TONY MON: Absolutely.
>
> DAVID KELLER: Yes, yes.

(Am. Compl. ¶ 105.)

On September 7, 2005, the Company filed with the SEC a prospectus (the "September 2005

Prospectus").  Defendants stated the following:

> We are the managing member of the Transeastern JV. We and the Falcone Entity each hold
> a 50% voting interest in the joint venture. The Transeastern JV is funded with $675.0 million
> of third party debt capacity (of which $560.0 million was drawn), a $20.0 million
> subordinated bridge loan from us and $165.0 million of equity, of which $90.0 million was
> contributed by us. The third party debt is secured by the joint venture's assets and ownership
> interests and is non-recourse to us.

(Am. Compl. ¶ 115.)

We have entered into, and expect to expand our use of, joint ventures that acquire and develop land for our Homebuilding operations and/or that also build and market homes for sale to third parties. In addition, we have, on a selective basis, entered into joint ventures that acquire and develop land for sale to unrelated third parties. Through joint ventures, we reduce and share our risk associated with land ownership and development and extend our capital resources. Our partners in these joint ventures generally are unrelated homebuilders, land sellers, financial investors or other real estate entities. In joint ventures where the assets are being financed with debt, the borrowings are non-recourse to us.

(Am. Compl. ¶ 116.)

Similarly, at page S-43 of the September 2005 Prospectus, Defendants again stated that the Transeastern JV debt was non-recourse to TOUSA: "In joint ventures where the acquisition, development and/or construction of the property are being financed with debt, the borrowings are non-recourse to us." (Am. Compl. ¶ 117.) The September 2005 Prospectus also stated that:

The Transeastern JV is funded with $675.0 million of third party debt capacity (of which $560.0 million was drawn), a $20.0 million subordinated bridge loan from us and $165.0 million of equity, of which $90.0 million was contributed by us. The third party debt is secured by the joint venture's assets and ownership interests and is non-recourse to us.

(Am. Compl. ¶ 118.)

On November 9, 2005, Defendants caused the Company to file with the SEC its quarterly report on Form 10-Q for the period ending September 20, 2005 ("September 20, 2005 Form 10-Q"). Defendants Keller and Kotler signed the September 30, 2005 Form 10-Q.[2]  The September 20, 2005 Form 10-Q stated:

The Transeastern JV was funded with $675.0 million of third party debt capacity (of which $560.0 million was drawn upon acquisition), a $20.0 million subordinated bridge loan from us and $165.0 million of equity, of which $90.0 million was contributed by us. The third party debt is secured by the Transeastern JV's assets and ownership interests and is non-recourse to us.

---

[2] Annexed as exhibits to the September 20, 2005 Form 10-Q were Sarbanes-Oxley certifications that Defendants Mon and Keller signed.  (Am. Compl. ¶ 131.)

6

* * *

> We have entered into, and expect to expand our use of, joint ventures that acquire and develop land for our Homebuilding operations and/or that also build and market homes for sale to third parties. In addition, we have, on a selective basis, entered into joint ventures that acquire and develop land for sale to unrelated third parties. Through joint ventures, we reduce and share our risk associated with land ownership and development and extend our capital resources. Our partners in these joint ventures generally are unrelated homebuilders, land sellers, financial investors or other real estate entities. In joint ventures where the assets are being financed with debt, the borrowings, generally are non-recourse to us.

(Am. Compl. ¶ 129.)

On March 10, 2006, Defendants caused the Company to file with the SEC its 2005 Form 10-K.  Defendants Mon, Keller, Kotler and McAden signed the 2005 Form 10-K.  In addition to signing the 2005 Form 10-K, Defendants Mon and Keller signed the certifications under Sarbanes-Oxley.  For the first time, the Company disclosed the existence of the Guarantees.  Specifically, Defendants stated, in relevant part:

> The Transeastern JV was funded with $675.0 million of third party debt capacity (of which $560.0 million was drawn upon acquisition), a $20.0 million subordinated bridge loan from us and $165.0 million of equity, of which $90.0 million was contributed by us. The third party debt is secured by the Transeastern's assets and ownership interests and is non-recourse to us, except that we have agreed to complete any property development commitments on the existing work in process at the time of closing in the event the Transeastern JV defaults and to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts.

(Am. Compl. ¶ 151.)  On March 13, 2006, the price of the Company's stock closed at $18.48 per share, down from the previous day's close of $18.65 per share.  (Am. Compl. ¶ 153.)

On May 8, 2006, Defendants caused the Company to issue a press release in which, among other things, it announced its financial results for the quarter ended March 31, 2006.  In discussing the Company's joint ventures, which include the Transeastern JV, the May 8, 2006 press release stated in relevant part:

> We have entered, and expect to continue to enter, into joint ventures that acquire and develop land for our Homebuilding operations and/or that also build and market homes for sale to third parties. Through joint ventures, we reduce and share our risk associated with land ownership and development and extend our capital resources. Our partners in these joint ventures generally are unrelated homebuilders, land sellers, financial investors or other real estate entities. In joint ventures where the assets are being financed with debt, the borrowings are non-recourse to us except that we have agreed to complete certain property development commitments in the event the joint ventures default and to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts.

(Am. Compl. ¶ ¶ 163.)

On May 9, 2006, Defendants caused the Company to file with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2006 ("March 31, 2006 Form 10-Q"). Defendants Keller and Kotler signed the March 31, 2006 Form 10-Q and certified to the accuracy of the information contained therein.[3] The March 31, 2006 Form 10-Q contained the following statements:

> We have entered, and expect to continue to enter, into joint ventures that acquire and develop land for our Homebuilding operations and/or that also build and market homes for sale to third parties. Through joint ventures, we reduce and share our risk associated with land ownership and development and extend our capital resources. Our partners in these joint ventures generally are unrelated homebuilders, land sellers, financial investors or other real estate entities. In joint ventures where the assets are being financed with debt, the borrowings are non-recourse to us except that we have agreed to complete certain property development commitments in the event the joint ventures default and to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts.

(Am. Compl. ¶ 169.)

On August 7, 2006, Defendants caused the Company to issue a press release that discussed in part the Company's joint ventures, which include the Transeastern JV:

> In joint ventures where the assets are being financed with debt, the borrowings are non-recourse to us except that we have agreed to complete certain property development commitments in the event the joint ventures default and to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts.

---

[3] Annexed to the March 31, 2006 Form 10-Q were Sarbanes-Oxley certifications that Defendants Mon and Keller signed. (Am. Compl. ¶ 173.)

(Am. Compl. ¶ 182.)

On August 8, 2006, Defendants caused TOUSA to file with the SEC its Form 10-

Q for the period ended June 30, 2006 (the "June 30, 2006 Form 10-Q").[4] Defendants Kotler

signed the March 31, 2006 Form 10-Q, and Defendants Mon and Kotler certified to the

accuracy of the information contained therein. (Am. Compl. ¶ 192.)  The June 30, 2006 Form 10-Q

contained the following statements concerning the purported non-recourse nature of the JV's debt:

> In joint ventures where the assets are being financed with debt, the borrowings are non-recourse to us except that we have agreed to complete certain property development commitments in the event the joint ventures default and to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts.

(Am. Compl. ¶ 193.)

On September 27, 2006, the Company issued the following two press releases announcing that

the Transeastern JV would not meet earlier financial projections:

> HOLLYWOOD, Fla., September 27, 2006 — TOUSA (NYSE: TOA) announced today that it met with the lenders to the Transeastern joint venture to update them on the financial position of the joint venture and the Florida housing market conditions.
>
> "As the managing member of the joint venture, our discussions with the lenders focused on the current Florida housing market conditions and the joint venture's inability to meet its original projections," said Antonio B. Mon, President and Chief Executive Officer of TOUSA. "When the joint venture was formed in August of 2005, Transeastern had more than 3,000 homes in backlog and projected 2006 deliveries of approximately 3,500 homes. Since that time, the Florida housing market has become more challenging, characterized by weak demand, an over supply of new and existing inventory homes, increased competition, and an overall lack of buyer urgency. These well-documented conditions have caused elevated cancellation rates and downward pressure on margins, due to increased sales incentives and higher advertising and broker commissions. Although we anticipated a gradual slowdown in the Florida housing market, these conditions have been more severe than anticipated and have negatively impacted the joint venture's ability to meet its projections."

---

[4] Annexed as exhibits to the June 30, 2006 Form 10-Q were Sarbanes-Oxley certifications that Defendants Mon and Kotler signed. (Am. Compl. ¶ 195.)

Tommy McAden, President of the joint venture, continued, "The joint venture has implemented several initiatives to reduce costs, streamline its operations, and increase efficiencies, but these initiatives have not been able to fully offset the reduction in profitability caused by the current market conditions. Currently, the venture's revised sales and delivery projections are not adequate to support the existing capital structure. The joint venture is exploring options to provide sufficient liquidity including, requesting waivers from its lenders regarding potential defaults and permitting future advances under the revolving credit facility; and restructuring land bank obligations. At this time, the joint venture partners do not intend to contribute capital under the existing capital structure."

* * *

HOLLYWOOD, Fla., September 27, 2006 — TOUSA (NYSE: TOA) announced today that it is providing the following additional information in response to investor inquiries on the earnings contributions and guidance from its Transeastern joint venture.

The Transeastern joint venture contributed $4 million of the $37.9 million reported as income from joint ventures for the six months ended June 30, 2006. Additionally, 2006 guidance on income from joint ventures of $115 — $130 million reflected pretax earnings from the Transeastern joint venture in the range of $6-$9 million.

(Am. Compl. ¶ 198.)

Next, on September 29, 2006, the Defendants caused the Company to issue another press release which stated in pertinent part that the "debt of the Joint Venture is secured solely by its assets." (Am. Compl. ¶ 203.) Soon thereafter, Defendants were engaging in regular meetings with the Lenders during which the Lenders told TOUSA that they knew about the problems at the Transeastern JV and demanded that TOUSA satisfy its obligations under the Guarantees. On November 6, 2006, Defendants caused the Company to publicly disclose receipt of the Demand Letters and reveal in a current report on Form 8-K filed with the SEC that a declaration of bankruptcy by the Transeastern JV would trigger TOUSA's obligation to repay Transeastern's debt. In that report, the Company stated:

The Credit Agreements are secured by the Joint Venture's assets and ownership interests and are non-recourse to the Companies, except that the Companies have entered into completion agreements relating to completion of work on property as to which work was in process at the

10

time of execution of the Credit Agreements on August 1, 2005, in the event the Joint Venture
failed to do so (the "Completion Guarantees") and carve out guarantees to indemnify the
lenders for losses resulting from fraud, misappropriation and similar acts by the Joint Venture
or full repayment of the loans in the event the Joint Venture voluntarily filed for bankruptcy
protection (the "Carve Out Guarantees" and collectively with the Completion Guarantees, the
"Guarantees").

(Am. Compl. ¶ 220.)

On November 7, 2006, the Company issued a press release contesting that it was

liable under the Guarantees:

> HOLLYWOOD, Fla., November 7, 2006 - Technical Olympic
> USA, Inc. (NYSE: TOA) announced today that in response to
> demand for payment under certain limited guaranties provided by
> TOUSA in connection with the financing of the Transeastern Joint
> Venture, it has informed Deutsche Bank Trust Company America
> ("Deutsche Bank"), the administrative agent for the lenders, that it
> does not believe that its obligations pursuant to the Guarantees
> have been triggered. TOUSA has formally disputed the assertion
> and is in discussions with the Administrative Agent and the lenders
> concerning this situation.
>
> In a letter dated November 6, 2006 to Deutsche Bank, TOUSA
> asserted that the "problems" being experienced by the Transeastern
> Joint Venture have not been caused by the actions of TOUSA.
>
>       \* \* \*
>
> "We fully intend to honor whatever obligations we may have under
> the loan guaranties," stated Antonio B. Mon, President and Chief
> Executive Officer of TOUSA. "However, our analysis of the facts
> is not complete and we believe that we have yet to uncover all
> relevant issues that might factor into any ultimate resolution. As
> such, any demands being placed on TOUSA at this stage of the
> review are clearly premature. It is our belief that the circumstances
> being experienced by the Transeastern Joint Venture today are
> clearly a reflection of the Joint Venture's inability to sell and
> deliver the volume of homes necessary to support the capital
> structure due to the downturn in the Florida housing market.
> Furthermore, we continue to believe in the quality of the Joint
> Venture's assets and look forward to reaching a solution for all

11

parties."

> The Demand Letters allege that the Joint Venture has failed to
> comply with certain of its obligations pursuant to the Credit
> Agreements and as a result multiple potential defaults and events
> of default have occurred which allegedly have triggered the Companies'
> obligations pursuant to the Guarantees', and that TOUSA pay its obligations
> under the Guaranties.

(Am. Compl. ¶ 221.)   As a result of this disclosure, the price of the Company's stock declined by

over 30%.  (Am. Compl. ¶ 254.)

On November 14, 2006, Defendants caused the Company to file with the SEC on

Form 10-Q its interim report for the period ending September 30, 2006 (the "September 30, 2006

Form 10-Q"). Defendant Kotler signed the September 30, 2006 Form 10-Q. Regarding the JV,

the September 30, 2006 Form 10-Q contained the following statements:

> In September 2006, management of the Transeastern JV developed and
> distributed to its members financial projections that indicated the joint
> venture would not have the ability to continue as a going concern under
> the current debt structure, at which time it began discussions with its lenders.
>
>       * * *
>
> As a result of these factors, we evaluated the recoverability of our
> investment in the Transeastern JV, under APB 18, The Equity
> Method of Accounting for Investments in Common Stock ("APB
> 18"), and have determined our investment to be fully impaired. At
> September 30, 2006, our investment in the Transeastern JV
> amounted to $143.6 million, which includes $35.0 million of
> member loans receivable and $16.2 million of receivables for
> management fees, advances and interest due to us from the
> Transeastern JV. During the three months ended September 30,
> 2006, we wrote-off our $143.6 million investment, which is
> included in loss from joint ventures in the accompanying
> consolidated statement of operations.
>
>       * * *
>
> On October 31, 2006 and November 1, 2006, we received letters
> (the "Demand Letters") from Deutsche Bank demanding payment

under the Completion and Carve Out Guarantees. The Demand
Letters allege that the Transeastern JV has failed to comply with
certain of its obligations pursuant to the Credit Agreements. The
Demand Letters allege potential defaults and that events of default
have occurred under the Guarantees that have triggered our
obligations to pay all of the outstanding obligations under each of
the Credit Agreements. We do not believe that our obligations
pursuant to the Guarantees have been triggered and we have
formally disputed these allegations. We are in discussions with the
Administrative Agent and the lenders concerning this situation.

       * * *

Under the Carve Out Guarantees, we and our joint venture partner
have agreed to indemnify the lenders for any liabilities,
obligations, losses, damages, penalties, actions, judgments, suits,
costs, charges, expenses and disbursements arising out of certain
matters. These matters include fraud or material misrepresentation
by any of the borrowing entities, the misappropriation by the
borrowing entities of certain payments, improper use of insurance
proceeds, intentional misconduct or waste with respect to the
collateral and failure to maintain insurance. In addition, upon the
filing of a voluntary petition in bankruptcy by any of the
borrowers, we and our joint venture partner would be responsible
for payment of the full amount of the outstanding loans. Although
the lenders have alleged losses, we have denied their allegations.
For example, we are evaluating the calculations of the borrowing
bases submitted to the Administrative Agent which were used to
determine available credit. If a miscalculation existed, it could be
deemed a misrepresentation. If it is determined that the lenders
incurred losses from a miscalculation, we could be responsible for
such losses. This and other matters related to these Guarantees
are currently unresolved, and the extent of damages, if any, is not
determinable.

(Am. Compl. ¶ 229.)

On March 19, 2007, the Company issued a press release disclosing the massive write-offs

relating to the JV and stating that the Company was taking a $275 million loss contingency relevant

to the restructuring of the Transeastern JV and the settlement of the Lenders' lawsuit and was taking

a $97.9 million charge.  (Am. Compl. ¶ ¶ 235-36.)   The price of the Company's stock fell 24% on

March 20, 2007. (Am. Compl. ¶ 238.)

In moving to dismiss the Amended Complaint, Defendants make the following arguments:
(1) Plaintiff's allegations do not establish materially false or misleading statements or omissions;
(2) Plaintiff cannot establish loss causation; (3) Plaintiff does not plead with particularity facts
giving rise to a strong inference that Defendants acted with scienter; (4) Plaintiff's Exchange Act
Section 20(a) claims must be dismissed for failure to allege that Defendants culpably participated
in a primary violation and (5) Plaintiff failed to serve timely Defendant McAden.

  II.  Legal Standard for Motion to Dismiss

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of
the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground
upon which it rests." Fed.R.Civ.P. 8(a). The Supreme Court has held that "[w]hile a complaint
attacked by a Rule 12(b) (6) motion to dismiss does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.
Factual allegations must be enough to raise a right to relief above the speculative level." Bell
Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.
Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Id.  Thus, "only a complaint that states a plausible
claim for relief survives a motion to dismiss." Id. at 1950.  When considering a motion to

dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a

plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S.

69, 73 (1984).

### III. Pleading Securities Fraud

Plaintiff's claims include a securities fraud claim pursuant to section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17

C.F.R. § 240.10b-5, and a claim for violation of section 20(a) of the Exchange Act, 15 U.S.C. §

78t, against all Defendants.   To state a claim for securities fraud under Section 10(b), a plaintiff

must allege that each defendant (1) made a misstatement or omission; (2) of a material fact; (3)

made with scienter; (4) on which the plaintiff relied; (5) that proximately caused the plaintiff's

injury.  Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006) quoting Bryant v.

Avado Brands, Inc., 187 F.3d 1271, 1281; Brushi v. Brown, 876 F.2d 1526, 1528 (11th Cir. 1989).

In addition, Plaintiff's claims under Section 10(b) and Rule 10b-5 must satisfy the exacting

pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"

"Reform Act").  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The

[Reform] Act requires plaintiffs to state with particularity both the facts constituting the alleged

violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate,

or defraud.'")   _____

_____ Group Pleading

Under the group pleading doctrine, the identification of the individual sources of

statements is unnecessary when the fraud allegations arise from misstatements or omissions in

group-published documents, such as Annual Reports, prospectuses, registration statements, press

releases, or other "group published information" that presumably constitute the collective actions

of those individuals involved in the day-to-day affairs of the corporation. In re Sunbeam Securities

Litigation, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999).  The Eleventh Circuit has noted the

debate among other courts as to the viability of the group pleading doctrine in the wake of the

PSLRA, but it has explicitly declined to rule on the issue. Phillips v. Scientific-Atlanta, Inc., 374

F.3d 1015, 1018- 19 (11th Cir. 2004) . Because the Eleventh Circuit has not ruled on this issue,

and because other courts from the Southern District Court of Florida have permitted it, the

Amended Complaint will not be dismissed on this ground as long as, in addition to alleging that

Defendants made a material misstatement attributable to them at the time of public dissemination,

Plaintiffs make specific factual allegations that the each of the individual Defendants, due to their

high ranking positions and direct involvement in the everyday business of the company, were

directly involved in controlling the content of the statements at issue. Hubbard v. BankAtlantic

Bancorp, Inc., 625 F. Supp. 2d 1267, 1282 n.9 (S.D. Fla. 2008); Bruhl v. Conroy, No. 03-23044,

2007 WL 983228, at * 3 (S.D. Fla. Mar. 27, 2007);  Holmes v. Baker, 166 F. Supp. 2d 1362, 1373

(S.D. Fla. 2001); In re Sunbeam Securities Litigation, 89 F. Supp. 2d at 1340-41.  Significantly,

the group pleading doctrine does not apply to the scienter requirement.  Hubbard, 625 F. Supp. 2d

at 1282 n.9; Bruhl,  2007 WL 9832228, at * 3; Holmes v. Baker, 166 F. Supp. 2d at 1376.

　　　After reviewing the Amended Complaint, the Court finds that the fraud allegations clearly

arise from misstatements or omissions in the requisite group-published documents.  What is

missing, however, are allegations showing that Defendants were insiders who were directly

involved in controlling the content of the statements at issue.  Instead, the Court finds that the

Amended Complaint contains conclusory allegations regarding the role Defendants played in the

Company.  (See, e.g., Am. Compl. ¶ ¶ 284, 286, 287.)  For instance, Plaintiff alleges that

"Defendants, because of their positions as officers and/or directors of the Company, were able to

and did control the content of TOUSA's SEC filings, press releases and presentations to securities

analysts, and other public statements pertaining to the Company during the Class Period." (Am.

Compl. ¶ 29; see also Am. Compl. ¶ ¶ 30-32.)  To the extent Plaintiff can plead in good faith and

subject to the requirements of Rule 11, Plaintiff should amend the Amended Complaint to include

allegations of Defendants' specific functions and management role in the Company.  See Bruhl,

2007 WL 9832228, at * 3 (group pleading standard satisfied by pleading that the director

defendants were "intimately involved insiders, directly involved in the day-to-day activities of the

Funds . . . its management and the statements provided to investors"); see also Iqubal, 129 S. Ct.

at 1950 ("[w]hile legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations").

        Misstatement or Omission

        The Court finds that the various statements about TOUSA's obligation to pay the

Transeastern JV's debt were misleading. Even assuming  the debt was correctly described as non-

recourse, Defendants failed to disclose the guarantees and failed to disclose TOUSA's

responsibilities under the guarantees.  These omissions reasonably could have caused an investor

to conclude that TOUSA had no responsibility whatsoever for the debt.  Thus, these omissions

failed to state facts that would be necessary to know in order to keep the non-recourse statement

from being misleading.  As such, the statements to investors that the JV debt was non-recourse

sufficiently alleges a misstatement within the meaning of 10(b)(5).  However, the remaining

statements highlighted by Plaintiff are not actionable.  These statements include Defendants'

remarks about the overall state of the housing market and general statements about the role of joint ventures in reducing risk.  (See, e.g., Am. Compl. ¶¶ 101, 124, 140, 176, 214.)  These remaining statements contained meaningful cautionary language that falls under the PSLRA safe harbor provision.  See Ehlert v. Singer, 245 F.3d 1313, 1319 (11th Cir. 2001).

Materiality

The vast majority of the allegations regarding the JV debt concern omissions to investors about the contingent liability.   An omitted fact is material if there is a "substantial likelihood that a reasonable shareholder would consider it important" in deciding how to act.  Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988).  When considering whether an omitted fact is material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  Id. at 231-32.  "Materiality is traditionally a question for the trier of fact."  Klein v. General Nutrition Cos., Inc., 186 F.3d 338, 342 (3d Cir. 1999).  However, "when alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, dismissal is warranted."  Ieradi v. Mylan Laboratories, Inc., 230 F.3d 594, 599 (3d Cir. 2000) (internal quotation marks omitted).  After careful consideration, the Court finds that whether or not the highlighted statements regarding the JV debt was material is a question of fact inappropriate for resolution on a motion to dismiss. Thus, the Amended Complaint is not subject to dismissal on this basis.

Scienter

In this Circuit, it is well-established that the element of scienter requires a showing of either an "intent to deceive, manipulate, or defraud" or "severe recklessness."  Mizzaro v. Home

Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008); Bryant, 187 F.3d at 1284.  Severe recklessness

requires more than "inexcusable negligence." Ziemba, 256 F.3d 1194, 1202 (11th Cir. 2001); see

also Ernst & Ernst v. Hochfelderl, 425 U.S. 185, 193 n.12 (1976).  The Eleventh Circuit has

defined "severe recklessness" as "those highly unreasonable omissions or misrepresentations that

involve not merely simple or even inexcusable negligence, but an extreme departure from the

standards of ordinary care, and that present a danger of misleading buyers or sellers which is

either known to the defendant or is so obvious that the defendant must have been aware of it."

Bryant, 187 F.3d at 1282 n.18; McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th

Cir. 1989).

    With respect to the statements in paragraphs 96, 115,129, 169 and 193, Plaintiff alleges

that the element of scienter can be established by looking to paragraphs 75 through 93.   For the

most part, however, these paragraphs merely contain statements by confidential witnesses that

reflect an awareness by some Defendants that the homebuilding industry was experiencing a

downturn  (see, e.g., Am. Compl. ¶ ¶ 76-81) and do not rise to the level of severe recklessness

required to establish scienter.

    Likewise, with respect to the statement in paragraph 151, Plaintiff alleges that Defendants'

lack of due diligence meant that no one at TOUSA knew the value of the assets that TOUSA had

acquired from the Transeastern transaction.  Of course, that statement does not show that

Defendants acted with an intent to deceive or with severe recklessness.  Instead, it shows that

Defendants may have acted negligently.  Furthermore, while a confidential witness states that

"less than 20% of the JV's assets were viable," knowledge of that fact cannot be imputed to

Defendants.  As such, scienter cannot be established.

Many of the remaining allegations concerning the JV Transeastern transaction lack the necessary facts that demonstrate Defendants acted with scienter.  For example, the allegations do not demonstrate that Defendants knew that the JV debt had a strong likelihood of becoming due or understood the depth of liability faced by TOUSA once the JV debt was invoked.  See Broad v. Rockwell International Corp., 642 F.2d 929, 961-62 (5th Cir. 1981) (the defendant's failure to disclose the workings of an indenture provision for remote future contingencies in the prospectus and other sales materials was evidence of negligence only).  Other allegations rest solely on the Defendants' role in the company.  See Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002) (allegations that the defendants should have known about internal control problems based on corporate positions within the company are inadequate to show scienter); In re Smith Gardner Securities Litigation, 214 F. Supp. 2d 1291, 1303 (S.D. Fla. 2002) ("[m]ere allegations that the defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter").  Nor are there allegations that indicated the presence of "red flags" where anyone advised Defendants or expressed concern to Defendants that the Company was engaging in fraud. See Garfield v. NDC Health Corp., 466 F.3d 1255, 1266-67 (scienter can be established when there are "glaring accounting irregularities or other 'red flags' that the financial statements contained material misstatements or omissions"); Ziemba v. Cascade International, Inc., 256 F.3d at 1210 ("Plaintiffs have pointed to no 'tips,' letters, or conversations raising inferences that C&L knew of any fraud. Furthermore, Plaintiffs have pointed to no facts suggesting that C&L was severely reckless in not knowing about any fraud").  Thus, the facts do not show that Defendants acted with severe recklessness.  Other of the remaining allegations (see, e.g., Am. Compl. ¶¶ 163, 182, 220) fail to

link any allegations of scienter to a particular named Defendant, and instead impermissibly make generic allegations against all defendants as a group. See Holmes v. Baker, 166 F. Supp. 2d 1362, 1376 (S.D. Fla. 2001) (the group pleading doctrine does not apply to the scienter requirement).[5]

Loss Causation

To establish a claim under Section 10(b), Plaintiff must adequately plead loss causation, meaning that Plaintiff must show that the fraudulent statement or omission was the cause of the actual loss suffered.  15 U.S.C. § 78u-4(b)(4); Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005).  Notably, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and causal connection that the plaintiff has in mind."  Id. at 347.  In this case, the Amended Complaint states that Defendants did not disclose the existence of the Guarantees until seven months after the acquisition on March 10, 2006 (Am. Compl. ¶ 151) and that all comments about the JV debt were limited to descriptions of the debt as non-recourse.  Once disclosed, the Amended Complaint alleges that the stock prices dropped. (Am. Compl. ¶ 153.)   The Amended Complaint also alleges that, on November 7, 2006, once TOUSA's possible responsibility for the entire JV debt became known, the price of the Company's stock declined by over 30%.  (Am. Compl. ¶ ¶ 252-54.)   The Amended Complaint also alleges that on March 19, 2007, the Company issued a press release disclosing massive write-offs relating to the JV and that the Company was "taking a $275 million loss contingency relevant to the restructuring of the Transeastern JV and the settlement of the Lenders' lawsuit and was taking a $97.9 million charge." (Am. Compl. ¶ ¶ 235-36.)  The price of

_____

[5] Significantly, Plaintiff concedes that the group pleading doctrine cannot be used to support an inference of scienter. (DE 197 at 12 n.12.)

the Company's stock thereafter declined by 24%. (Am. Compl. ¶ 238.)

The Court finds that these facts sufficiently pled loss causation.  Simply put, Plaintiff highlights various disclosures that led to subsequent price declines.  Defendant Mon disagrees, and instead argues that TOUSA previously disclosed the existence and scope of the guarantees prior to November 6, 2006.  In addition, Defendant Mon claims that because TOUSA affirmatively disclosed the guarantees after March 10, 2006, Plaintiff has no claim after that date.  Lastly, Defendant Mon states that Plaintiff has not pled that the decline in stock prices in March 2007 resulted from disclosure of previously disclosed information.  The Court disagrees.  The Court finds that the causation issue is inextricably woven into factual questions such as whether or not the guarantees were *fully* revealed to the shareholders.  The Amended Complaint alleges that Defendant did not fully disclose all the information regarding the JV Transeastern transaction until March 2007.  Furthermore, the Amended Complaint also alleges that each of the disclosures (March 2006, November 2006, March 2007) resulted in further losses.

Controlling Person Liability

Plaintiff also brings claims pursuant to section 20(a) of the Exchange Act against the individual Defendants.  Section 20(a) states that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To state a section 20(a) claim against Defendants, Plaintiff must allege that (1) a primary violation of section 10(a) of the Exchange Act; (2) Defendants' power to control the general

22

business affairs of the controlled person and (3) Defendants' power to "directly or indirectly control or influence the specific corporate policy which resulted in primary liability." Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001). As discussed supra, the Court has found that the Amended Complaint has various pleading deficiencies and therefore must be dismissed. Thus, given that the section 20(a) count rests upon violations of section 10(b), the Court must also dismiss the section 20(a) count.[6]

> Service Over Defendant McAden

Defendant McAden also moves for dismissal of the Amended Complaint pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. Rule 4(m) provides in part:

> **Time Limit for Service**. If a defendant is not served within 120 days after the Complaint is filed, the court - on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

McAden was first named in Diamondback Capital Management's[7] ("Diamondback") consolidated Complaint filed on November 2, 2007 (DE 85). Once the Court appointed Bricklayers as lead Plaintiff, Bricklayers filed an Amended Complaint on September 19, 2008 (DE 174) and McAden was served for the first time in this action on January 6, 2009 (DE 192 and

---

[6] Based on Eleventh Circuit precedent, the Court declines to adopt Defendant Mon's invitation to adopt the culpable participation test for Section 20(a) claims. Laperriere v. Vesta Insurance Group, Inc., 526 F.3d 715 (11th Cir. 2008); Brown v. Enstar Group, Inc., 84 F.3d 393 (11th Cir. 1996).

[7] The Court initially appointed Diamondback lead plaintiff in this case. Diamondback subsequently moved to withdraw as lead plaintiff on April 30, 2008 (DE 123) and the Court appointed Bricklayers lead plaintiff on July 15, 2008 (DE 160).

194).[8]

McAden asserts that dismissal of the Amended Complaint is required because he was not served until ten months after the expiration of the service deadline. In addition, McAden states that the 120-day requirement in Rule 4(m) is not re-started by the filing of an Amended Complaint. McAden also states that Plaintiff is unable to demonstrate good cause for its failure to serve him timely. In response, Plaintiff points out that the Amended Complaint filed by Bricklayers was served upon McAden within 120 days. Finally, Plaintiff contends that dismissal of the Complaint would result in a needless waste of judicial resources.

Under Rule 4(m), the failure to effect service within 120 days of the filing of a complaint mandates dismissal. Fed. R. Civ. P. 4(m). However, a plaintiff may request an extension of time for service of process upon the showing of good cause. Id. A plaintiff has the burden of demonstrating the existence of "good cause" justifying service outside of the 120-day deadline. Sanders v. Fluor Daniel, Inc., 151 F.R.D. 138, 139 (M.D. Fla. 1993); Wilson v. Prudential Financial, 332 F. Supp. 2d 83, 87 (D.D.C. 2004) ("[W]here the plaintiff fails to effect proper service within the 120-day time limit laid down by Rule 4(m), the plaintiff carries the burden of showing good cause for that failure"). To demonstrate good cause, the plaintiff must offer evidence that he (1) has proceeded in good faith; (2) has a reasonable basis for noncompliance and (3) the basis for the delay was more than simple inadvertence or mistake. Id.; Prisco v. Frank, 929 F.2d 603, 604 (11th Cir.1991), superseded in part by rule as stated in, Horenkamp v. Van Winkle and Co., 402 F.3d 1129 (11th Cir. 2005); Horenkamp, 402 F.3d at 1130-31.

_____

[8] McAden states that he was served on January 16, 2009, however, the return of service filed with the Court states that service was accomplished on January 6, 2009.

Here, there is no question that McAden was not served within the 120-day time period prescribed by Rule 4(m).  McAden was first named as a defendant in Diamondback's November 2, 2007 consolidated Complaint.  Thus, McAden should have been served within 120 days by Diamondback.  Notably, Diamondback did not move to withdraw from its status as lead plaintiff until April 30, 2008, more than 120 days after McAden was named as a defendant.  Because well over 120 days passed between the time McAden was named as a defendant and the time he was served, Rule 4(m) mandates the dismissal of the Amended Complaint against McAden, unless there is a showing based on good cause or the Court decides to exercise its discretion and extend the time for service without a showing of good cause.  McCurdy v. American Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998) (dismissal under Rule 4(m) may be avoided if plaintiff shows good cause or if a court chooses to exercise its discretion and extend time for service); Prisco, 929 F.2d at 604 (discussion of what constitutes "good cause").  "Rule 4(m) grants discretion to the district court to extend the time for service of process even in the absence of a showing of good cause."  Will-Burn Recording & Pub. Co. v. Universal Music Group Records, No. 08-0387-WS-C, 2008 WL 4793291, at * 2 (S.D. Ala. Nov. 4, 2008) quoting Horenkamp v. Van Winkle and Co., 402 F.3d at 1132. Factors that have guided courts in deciding to extend the time for service of process include whether the applicable statute of limitations would bar the refiled action,[9] or whether the defendant is evading service or has otherwise concealed a defect in service.  Id.

Here, Plaintiff has not made a showing of good cause for the delay.  Instead, Plaintiff

---

[9] Based on the current record, the Court cannot conclude, as a matter of law, that the statute of limitations would bar a refiled action against McAden.  Should Plaintiff decide to re-serve McAden, the Court will consider this argument, if raised by the parties.

claims that the McAden was timely served based on the filing of an Amended Complaint. However, as pointed out by McAden, the 120-day service requirement is not re-started as to a defendant already named in a prior complaint. See Morrison v. Morgan Stanley Props., No. 06-80751, 2008 WL 1771869, at * 2 (S.D. Fla. Apr. 15, 2008).   Furthermore, the current lead plaintiff has not demonstrated why it should not be bound by the actions or inactions of the previously named lead plaintiff relative to the failure to serve McAden timely.  Thus, the Court does not see any reason to extend the time for service based on this record.  Given the current procedural posture, the Court does not believe that unnecessary judicial resources will be expended by dismissing the Amended Complaint against McAden.  Accordingly, the Court will dismiss McAden as a defendant without prejudice under Rule 4(m) of the Federal Rules of Civil Procedure.

Leave to Amend

In sum, the Court grants Plaintiff leave to file a Second Amended Complaint.  The Second Amended Complaint must include allegations of Defendants' specific functions and management role in the Company and allegations that establish the element of scienter.  The Court finds that the Amended Complaint adequately alleges that the statements about TOUSA's obligations to pay the Transeastern's debt were misleading and material and caused Plaintiff's injury.  With respect to Plaintiff's section 20(a) claim, the Court will reconsider this claim once Plaintiff has re-pled the section 10(a) claim.

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant David J. Keller's Motion to Dismiss Plaintiff's Consolidated Amended Class Acton Complaint (DE 176);

26

Defendant Randy L. Kotler's Motion to Dismiss the Consolidated Amended Class Action Complaint (DE 177); Defendant Antonio B. Mon's Motion to Dismiss Plaintiff's Amended Class Action Complaint (DE 179) and Defendant Tommy L. McAden's Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint (DE 190) are **GRANTED** consistent with the dictates of this order.  Plaintiff is granted leave to file a Second Amended Complaint consistent with the directives set forth in this Order.  Plaintiff shall file the Second Amended Complaint **within thirty days of the date of entry of this Order.**

  **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of September, 2009.

      _____

      KENNETH A.  MARRA
      United States District Judge